Filed 3/11/26  In re Isaiah M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re Isaiah M., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.F.,<br><br>Defendant and Appellant. | E086984<br><br>(Super.Ct.No. DPRI2300420)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Malvina K. Ovanezova, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

Minh C. Tran, County Counsel, Jamila T. Purnell, Chief Assistant County Counsel, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

J.F. (Mother) appeals from the termination of her parental rights to her minor son, Isaiah M. She argues that the juvenile court erred by failing to apply the beneficial parental relationship exception under Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i) (unlabeled statutory references are to this code). Mother forfeited the issue by failing to raise it at the selection and implementation hearing, so we affirm.

BACKGROUND

In September 2023, the Riverside County Department of Public Social Services (DPSS) received a referral alleging general neglect and at-risk sibling abuse of E.M. (then 17 years old) and Isaiah M. (then 15 years old) by the parents.[1] DPSS reported that Isaiah "is wheelchair bound and has limited comprehension and speech abilities." He had a "red, dime-sized scratch under his right eye, which [was] swelling to a quarter." Isaiah had not been to school for a week, because Mother had injured her foot.

In October 2023, DPSS received another referral alleging general neglect and physical abuse. Isaiah went to school with three staples on his head, a scratch on his upper back, and a scratch on his left arm. He also had a rash and "slight swelling around his penial area. His teeth [were] rotted and jagged, and his clothing [was] dirty."

DPSS spoke to Mother and scheduled a "Child and Adolescent Needs and Strengths" exam for Isaiah, and Mother agreed to take him to the exam. The following

---

[1] E.M. is now 18 and is not involved in this appeal. Also, the children's father is not a party to this appeal and consequently will not be discussed.

week, DPSS received the report from Isaiah's exam. The report "indicate[d] suspected neglect but not physical abuse." DPSS then filed a petition under subdivision (b)(1) of section 300. In December 2023, the juvenile court conducted the initial hearing and adopted DPSS's recommendation that the children remain in Mother's care.

Isaiah had several health conditions including anoxic brain injury, spastic quadriplegic cerebral palsy, ineffective airway clearance, chronic lung disease, history of recurrent pneumonia, exotropia, partial optic atrophy of both eyes, and inadequate weight gain. He was "medically fragile" and "need[ed] extra care and more medical attention."

At the contested jurisdiction and disposition hearing in January 2024, the court found the allegations in the first amended petition true, adjudged the children dependents of the court, and ordered that the children remain in Mother's care with family maintenance services.

In February 2024, after DPSS received an immediate response referral alleging possible child abuse, Mother reported that she had used methamphetamine with a friend, and she subsequently tested positive for methamphetamine. DPSS later made two unannounced visits to Mother's motel room. During the first, Mother tested negative for all substances. During the second, Mother would not allow the social worker to enter the room, and she said that she enrolled in "substance treatment classes" and other services. She had not completed the "First Aid/CPR certification" or the training for care of medically fragile children.

3

In March 2024, DPSS obtained a protective custody warrant for Isaiah. In the probable cause statement, DPSS attested that it had been attempting "to gain access to . . . Isaiah in the home for the month of February and March as the child [was] not attending school and not attending his appointments," and "he ha[d] lost a substantial amount of weight."

When DPSS detained Isaiah pursuant to the warrant, the social worker accompanied the ambulance that took him to the hospital. The emergency room doctor said that Isaiah was being admitted to the hospital for malnutrition and failure to thrive. Isaiah's medical records showed that he had lost 31 pounds since October 2023.

DPSS filed a supplemental petition under section 387, alleging that Mother failed to comply with her court-ordered case plan and tested positive for methamphetamine. At the detention hearing, the court detained the children from Mother and ordered that Mother have supervised visits at least once per week for two hours.

Mother acknowledged that she had missed one of Isaiah's medical appointments, but she denied using methamphetamine. Mother visited Isaiah six times between March 22 and April 9, 2024.

At the jurisdiction hearing on the section 387 petition in April 2024, the court sustained the petition, removed the children from Mother's custody, and ordered family reunification services and twice weekly visits for Mother.

Isaiah was placed with foster parents who are licensed to care for medically fragile children. Isaiah's foster mother is a licensed vocational nurse, and his foster father is a

registered nurse and family nurse practitioner. Isaiah was gaining weight and seeing his doctors and therapists. Mother attended six of Isaiah's 13 appointments between April 2024 and August 2024. She participated in individual therapy and completed one portion of the training for care of medically fragile children. She visited Isaiah approximately 18 times out of the 30 visits available to her between April 2024 to September 2024.

At the six-month status review hearing in October 2024, the court continued Mother's family reunification services.

In March 2025, DPSS filed a report for the 12-month status review hearing. DPSS reported that Mother had been inconsistent with her participation in reunification services, and she had not made Isaiah's needs a priority. In September 2024, the public health nurse recommended that Mother attend all of Isaiah's medical appointments so that she "could have a full understanding of the care that is required." Mother missed five of Isaiah's six medical appointments between October 2024 and February 2025. She missed four of Isaiah's six physical therapy appointments between October 2024 and January 2025. She did not attend a child and family team meeting in January 2025 for Isaiah. And she visited approximately 21 times out of 34 visits available to her between October 2024 and February 2025.

At the contested 12-month review hearing in April 2025, the court terminated reunification services as to Isaiah and set a section 366.26 hearing. Mother's visitation was reduced to twice per month for one hour.

DPSS reported that Isaiah's placement with his current caregivers has "continued to provide stability and has facilitated [his] physical, emotional, developmental and educational needs."  DPSS observed that Isaiah smiled often at his caregivers when they spoke to him.

DPSS reported that it had notified Mother of Isaiah's medical appointments, and she had missed approximately 36 of his appointments.  DPSS reported that Mother did not have stable housing.  When asked about her inconsistent attendance at Isaiah's medical appointments, Mother reported that she had issues with transportation, errands, and traffic problems.  She visited Isaiah four times between March 2025 and mid-July 2025, and she missed five visits during that period.

In August 2025, Mother filed a section 388 petition asking that Isaiah be returned to her custody or, in the alternative, that her family reunification services be reinstated. At the selection and implementation hearing in September 2025, the court first considered Mother's section 388 petition.  Mother's counsel argued that Mother's circumstances had changed because she had shown "dedication and commitment to her sobriety" and had "reenrolled in all of her programs."  The court denied the petition on the grounds that Mother's circumstances were changing but not yet changed and that reinstating reunification services would not be in Isaiah's best interest.

The court then heard argument regarding the termination of parental rights. Mother's counsel argued, "First, if you consider the argument from previously, but also the .26—but also the minor is 17 at this point.  And so, Mother has provided care for this

critically disabled minor for most of his life.  And therefore, not only has she cared for him, but she has created a lifelong bond for a child who's nonverbal.  And for—it would be difficult—well, not difficult—impossible for him to explain to the Court or to anyone what his relationship is with his mother.  And so only Mother can explain that bond to the Court.  And Mother is pleading with the Court to understand what that bond must feel like for a mother who has to constantly, and at all times, be at the side of a critically disabled child to care for his every need for almost 17 years.  [¶]  And so, we are asking the Court to not terminate Mother's parental rights and this lifelong journey and sacrifice that she's made for her son.  And we are asking for the Court to consider that.  And also, if the Court decides differently, then we are certainly asking for post-adoptive visitation."

The court noted the current caretakers' medical training and "that they can provide and have provided for Isaiah this whole time; and, number two, that he's doing very well at this point in time, and he's had consistency.  And I know that his parents are obviously bonded with him.  But it is in his best interest to terminate parental rights."  The court then terminated parental rights.

## DISCUSSION

Mother argues that the court "erred by not applying the parental-benefit exception to termination of parental rights."  DPSS argues that Mother forfeited the argument by failing to raise it at the selection and implementation hearing.  We agree with DPSS.

"At a hearing under section 366.26, if the court finds by clear and convincing evidence that a minor is likely to be adopted, the court must terminate parental rights and

7

order the minor placed for adoption 'unless the court finds a compelling reason for determining that termination would be detrimental' due to one of the statutorily enumerated exceptions to adoption." (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 291.) "The parent has the burden of establishing an exception to termination of parental rights." (*Ibid*.) Under the beneficial parental relationship exception, the parent bears the burden of proving three elements by a preponderance of the evidence: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631, 636 (*Caden C.*).)

"The juvenile court does not have a sua sponte duty to determine whether an exception to adoption applies." (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) Consequently, if a parent fails to raise an exception at the selection and implementation hearing, then the issue is forfeited. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 402-403.) "The application of any of the exceptions enumerated in section 366.26, subdivision (c)(1) depends entirely on a detailed analysis of the relevant facts by the juvenile court. [Citations.] If a parent fails to raise one of the exceptions at the hearing, not only does this deprive the juvenile court of the ability to evaluate the critical facts and make the necessary findings, but it also deprives this court of a sufficient factual record from which to conclude whether the trial court's determination is supported by substantial evidence." (*Ibid*.; see also *Caden C.*, *supra*, 11 Cal.5th at p. 630 ["application of the beneficial parental relationship exception rests on a variety of factual determinations properly

8

reviewed for substantial evidence," although "the ultimate decision that termination would be harmful is subject to review for abuse of discretion"].)

Mother did not raise the beneficial parental relationship exception at the selection and implementation hearing. The juvenile court accordingly did not analyze the exception's elements, such as regular visitation and contact, and Mother's counsel did not object to the court's failure to do so. Counsel argued that Mother has a bond with Isaiah, but counsel never argued that Isaiah is bonded to Mother, that she visited him regularly, or that their relationship was so beneficial that, on balance, termination of parental rights would be detrimental to him. Because Mother did not raise the beneficial parental relationship exception at the selection and implementation hearing, we must reject her argument that the juvenile court erred by failing to apply the exception.[2]

---

[2] If the issue were not forfeited, we would still have to reject Mother's argument on the merits. The evidence does not compel a finding that Mother regularly visited Isaiah, so the juvenile court's failure to find in Mother's favor on the first element of the exception is sufficient by itself to require affirmance of the court's order. (*In re Raul V.* (2022) 82 Cal.App.5th 290, 301.) In addition, there is no evidence that Isaiah had trouble emotionally adjusting to placement out of Mother's care, suffered emotional dysregulation at the ends of visits, or manifested any adverse emotional or other consequences when Mother's visitation was reduced by 75 percent (from twice per week to twice per month) when Mother's reunification services were terminated. Thus, even if we assume for the sake of argument that the exception was raised, the juvenile court did not abuse its discretion by determining that any detriment that Isaiah might suffer from the termination of parental rights did not outweigh the benefits to Isaiah from adoption. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

10